## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| EMMA ROEDEL, BAILEY KOWALSKI, CAPRI DAVIS, JANE DOE 1, JANE DOE 2, SHERIDAN THOMAS, JANE DOE 3, and OTHER UNIDENTIFIED FEMALE DOES; | Case No.: |
| Plaintiffs, | Hon. |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; NCAA BOARD OF GOVERNORS; NCAA DIVISION I BOARD OF DIRECTORS; NCAA DIVISION I COUNCIL; MARK EMMERT, in his individual and official capacity; and OTHER UNIDENTIFIED DEFENDANTS; | |
| Defendants. | |

| | |
|---|---|
| Karen Truszkowski (P56929) TEMPERANCE LEGAL GROUP, PLLC Attorney for Plaintiffs 503 Mall Court #131 Lansing, MI 48912 844-534-2560 phone 800-531-6527 fax karen@temperancelegalgroup.com | Elizabeth K. Abdnour (P78203) ELIZABETH ABDNOUR LAW, PLLC Attorney for Plaintiffs 1146 S. Washington Ave., Ste. D7 Lansing, MI 48910 (517) 292-0067 phone elizabeth@abdnour.com |

## COMPLAINT AND JURY DEMAND

Plaintiffs EMMA ROEDEL, BAILEY KOWALSKI, CAPRI DAVIS, JANE DOE 1,

JANE DOE 2, SHERIDAN THOMAS, and JANE DOE 3, by and through their attorneys, KAREN

1

TRUSZKOWSKI and ELIZABETH K. ABDNOUR, hereby file the following Complaint against Defendants as captioned above.

**PARTIES, JURISDICTION, AND VENUE**

1. This is an action to address the failure of Defendants to address gender-based violence committed by male student-athletes against female students and student-athletes at colleges and universities under the purview of Defendant NCAA.

2. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(1) and 28 U.S.C. § 1332 (d)(2).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391 (d) as: a substantial part of the events or omissions giving rise to the claim occurred in this district and the Defendants are subject to personal jurisdiction in this district as their contacts would be sufficient to subject them to personal jurisdiction in this district and they conduct substantial business in this jurisdiction.

4. Plaintiff Emma Roedel ("Roedel") is a natural person and a citizen of the State of Michigan.  At all times relevant, Roedel was a student at Michigan State University ("MSU"), an NCAA Division I school, as well as a student-athlete on the MSU women's track team.

5. Plaintiff Bailey Kowalski ("Kowalski") is a natural person and citizen of the State of Michigan.  At all times relevant, Kowalski was a student at Michigan State University ("MSU"), an NCAA Division I school.

6. Plaintiff Capri Davis ("Davis") is a natural person and a citizen of the State of Texas.  At all times relevant, Davis was a student at the University of Nebraska Lincoln ("UNL"), an

NCAA Division I school, as well as a student-athlete on the UNL women's volleyball team.

7.     Plaintiff Jane Doe 1 ("JD1")[1] is a natural person and a citizen of the State of Nebraska. At all times relevant, JD1 was a student at UNL.

8.     Plaintiff Jane Doe 2 ("JD2")[2] is a natural person and a citizen of the State of Nebraska. At all times relevant, JD2 was a student at UNL.

9.     Plaintiff Sheridan Thomas ("Thomas") is a natural person and citizen of the State of Nebraska. At all times relevant, Thomas was either an admitted student or an active matriculating student at UNL.

10.    Plaintiff Jane Doe 3 ("JD3")[3] is a natural person and citizen of the State of Vermont. At all times relevant, JD3 was a student at an America East Conference school ("AEC school" or "AECS"), an NCAA Division I school, as well as a student-athlete on the AECS women's swim team.

11.    Plaintiffs Other Unidentified Female Does are natural persons and citizens of a variety of jurisdictions. At all times relevant, Plaintiffs Other Unidentified Female Does were students at NCAA member institutions.

12.    Defendant National Collegiate Athletic Association ("NCAA") is a nonprofit member-led organization that regulates student-athletes from 1200 North American educational institutions and athletics conferences and acts as the governing body of college and university sports at their member institutions and conferences.[4]

---

[1] Jane Doe 1 is a pseudonym.
[2] Jane Doe 2 is a pseudonym.
[3] Jane Doe 3 is a pseudonym.
[4] *What Is the NCAA?*, NCAA, http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited Apr. 20, 2020).

3

13.     Defendant NCAA touts itself as being "dedicated to the well-being and lifelong success of college athletes."[5]

14.     Defendant NCAA's headquarters and principal office is located in Indianapolis, Indiana.[6]

15.     According to Defendant NCAA's website, "Colleges, universities, athletic conferences and other affiliated organizations are NCAA members.  The NCAA national office staff in Indianapolis supports the members.  Together, the members and the national office staff are known as the NCAA."[7]

16.     Defendant NCAA oversees 88 championships in 23 sports. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities ("member institutions") within the NCAA.  The NCAA funnels in excess of $740,000,000 annually to NCAA member institutions.[8]

17.     Pursuant to its constitution, Defendant NCAA requires itself and its member institutions to comply with what it calls "The Principles for Conduct of Intercollegiate Athletics."[9]

18.     Defendant NCAA's Principles for Conduct of Intercollegiate Athletics include a number of commendable values and principles for member institutions, including requiring member institutions to oversee the ethics and compliance of their athletics program; ensure gender equity and nondiscrimination within their programs; and protect the health, safety,

---

[5] *Id.*

[6] *NCAA National Office*, NCAA, http://www.ncaa.org/about/who-we-are/national-office (last visited Apr. 6, 2020).

[7] *Frequently Asked Questions*, NCAA,  http://www.ncaa.org/about/frequently-asked-questions-about-ncaa  (last visited Apr. 6, 2020).

[8] NATIONAL COLLEGIATE ATHLETIC ASSOCIATION CONSOLIDATED FINANCIAL STATEMENTS AUGUST 31, 2019 AND 2018, NCAA (2019), https://ncaaorg.s3.amazonaws.com/ncaa/finance/2018-19NCAAFin_NCAAFinancials.pdf, (last visited Apr. 28, 2020).

[9] 2019-2020 NCAA DIVISION I MANUAL, NCAA (2019), https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited Apr. 6, 2020).

and well-being of their student-athletes.[10] Defendant NCAA is overseen by Defendant NCAA Board of Governors, which is comprised of presidents or chancellors of member institutions.[11]

19.     Defendant NCAA Board of Governors is the highest governing body of the NCAA.[12]

20.     According to Defendant NCAA's website:

> The NCAA Board of Governors is our highest governing body, bringing together presidents and chancellors from each division to discuss issues important to the entire NCAA membership. All association-wide governing bodies are charged with upholding and advancing the Association's core values of fairness, safety and equal opportunity for all student-athletes.[13]

21.     Defendant NCAA Board of Governors is responsible for the following, among other things: identifying core issues that affect the NCAA as a whole, acting on behalf of the Association by adopting and implementing policies to resolve core issues and other Association-wide matters, and initiating and settling litigation.[14]

22.     Defendant NCAA is divided into three divisions: Division I, Division II, and Division III.[15]

23.     Michigan State University, the University of Nebraska Lincoln, and the institution in the America East Conference referenced in this complaint are NCAA Division I members.[16]

24.     Each NCAA Division has its own governance system, in addition to the overall governance by the NCAA Board of Governors.

---

[10] *Id*. at 2.

[11] *Id*. at 15.

[12] *NCAA Board of Governors*, NCAA, http://www.ncaa.org/governance/committees/ncaa-board-governors (last visited Apr. 6, 2020).

[13] *Governance*, NCAA, http://www.ncaa.org/governance (last visited Apr. 6, 2020).

[14] *Division I Manual*, *supra* note 9, at 18.

[15] According to Defendant NCAA's Recruiting Facts flyer, NCAA Division I schools enroll the most students, manage the largest athletics budgets, and offer the most athletics scholarships.  There are 179,200 student-athletes and 351 colleges and universities in Division I.  *NCAA Recruiting Facts*, NCAA, https://www.ncaa.org/sites/default/files/Recruiting%20Fact%20Sheet%20WEB.pdf (last visited Apr. 21, 2020).

[16] *Division I Schools*, NCAA, http://www.ncaa.org/about/division-i-schools (last visited Apr. 6, 2020).

25.     Defendant NCAA Division I Board of Directors is the overall governing body of NCAA Division I.[17]

26.     Defendant NCAA Division I Board of Directors is responsible for, among other things: addressing future issues, challenges, opportunities and outcomes; focusing on strategic topics in intercollegiate athletics and its relationship to higher education; reviewing and setting parameters that guide and determine present and future decisions; embracing general goals and acceptable procedures; and reviewing and approving policies and procedures governing the infractions program.[18]

27.     Defendant NCAA Division I Council is a high-level group responsible for the day-to-day decision-making for Division I.[19]

28.     Defendant NCAA Division I Council is responsible for, among other things: identifying and examining trends and issues of intercollegiate athletics, overseeing Division I membership requirements and processes, and studying and making policy recommendations concerning opportunities for women in athletics and other issues directly affecting women's athletics.[20]

29.     At all material times, Defendant Mark Emmert (hereinafter "Emmert"), in his official capacity, was an agent and/or employee of the NCAA, acting or failing to act within the scope, course, and authority of his employment and his employer.

30.     At all material times, Emmert was the President of the NCAA, responsible for oversight and leadership of the entire organization.

---

[17] *Division I Manual*, *supra* note 9, at 19.
[18] *Id.* at 19-20.
[19] *Division I Council*, NCAA, http://www.ncaa.org/governance/committees/division-i-council (last visited Apr. 21, 2020).
[20] *Id.*

31.     Other Unidentified Defendants may be identified in the course of this litigation and
        Plaintiffs reserve the right to amend this Complaint to add them as defendants as they
        become known.

## THE NCAA'S DISTINCT LINE OF FAILURES
## IN ADDRESSING GENDER DISCRIMINATION

32.     In 2010, Defendant Emmert sent a letter to the National Coalition Against Violent Athletes
        ("NCAVA," which is now known as the We Lead Project).[21]

33.     Defendant Emmert wrote the letter to respond to concerns raised by NCAVA of pervasive
        sexual violence being perpetrated by male student-athletes against women.

34.     In his letter, Defendant Emmert defected blame from Defendant NCAA and placed the
        blame on colleges and universities.

35.     Defendant Emmert explicitly refused to consider enacting a Gender Based Violence Policy
        within the NCAA as proposed by NCAVA, stating "it is unlikely that the threat of NCAA
        sanctions...would have an impact."[22]

36.     Defendant Emmert's letter indicated a basic unwillingness to even consider identifying
        sexual assault and other forms of gender-based violence as possible NCAA violations.[23]

37.     Defendant Emmert wrote, "As a private, membership organization our authority is to
        investigate and discipline violations within our bylaws."[24]

38.     In 2010, Defendant NCAA's bylaws included the following as possible violations for
        student-athletes: eating a full meal rather than simply snacks at a school-related meeting,
        making telephone calls at school expense for "personal reasons," using an institution-

---

[21] Letter from Mark Emmert, President of NCAA, to NCAVA (2010).  *See* Exhibit 1.
[22] *Id*.
[23] *Id.*
[24] *Id*.

owned vehicle, accepting reimbursement for laundry or dry cleaning services, and allowing a coach to cover the costs of their rent or utilities if they are unable to make ends meet.[25]

39.   Yet Defendants refused to consider regulating sexual violence committed by student-athletes.

40.   In 2010, Defendant NCAA Board of Governors (then known as the NCAA Executive Committee)[26] directed the NCAA Committee on Sportsmanship and Ethical Conduct to support NCAA members in addressing sexual violence on campus.[27]

41.   In 2011, Defendant NCAA held a Summit on Violence Prevention.[28]

42.   In 2012, Defendant NCAA sponsored a think tank[29] that produced a comprehensive guide titled, "Addressing Sexual Assault and Interpersonal Violence: Athletics' Role in Support of Healthy and Safe Campuses," published in 2014.[30]

43.   That comprehensive guide makes no mention of disciplinary consequences for student-athletes who commit violent acts.[31]

---

[25] *2009-2010 Division I Manual*, NCAA, https://www.ncaapublications.com/productdownloads/D110.pdf (last visited Apr. 22, 2020).

[26] Brian Hendrickson, "Executive Committee changes name, clarifies role," NCAA (Oct. 31, 2014), http://www.ncaa.org/about/resources/media-center/news/executive-committee-changes-name-clarifies-role (last visited Apr. 28, 2020).

[27] NCAA BOARD OF GOVERNORS POLICY ON CAMPUS SEXUAL VIOLENCE UPDATED (2018), http://www.ncaa.org/sport-science-institute/topics/ncaa-board-governors-policy-campus-sexual-violence (last visited Apr. 27, 2020) [hereinafter POLICY ON CAMPUS SEXUAL VIOLENCE].

[28] *Id*.

[29] *Id*.

[30] DEBORAH WILSON ET AL., NCAA, ADDRESSING SEXUAL ASSAULT AND INTERPERSONAL VIOLENCE: ATHLETICS' ROLE IN SUPPORT OF HEALTHY AND SAFE CAMPUSES (2014), https://www.ncaa.org/sites/default/files/Sexual-Violence-Prevention.pdf (last visited Apr. 27, 2020).

[31] *Id*.

44.    In 2014, Defendant NCAA Board of Governors passed a resolution that stipulated that appropriately addressing sexual violence is integral to responsible intercollegiate athletics programs.[32]

45.    In 2015, Defendant NCAA convened a Sexual Assault Task Force with the charge of providing clear direction on a curriculum that would help athletic departments engage in education, collaboration, and compliance on sexual violence issues.[33]

46.    In 2016, on recommendation of the Sexual Assault Task Force, Defendant NCAA's Sports Science Institute produced a sexual violence prevention toolkit in 2016, which was updated in 2019.[34]

47.    The Sexual Violence Prevention Toolkit instructs Defendant NCAA member institutions as follows: "The prevalence and damaging effects of sexual violence on college students, including student-athletes, are extreme and unacceptable. NCAA member schools have a responsibility to address this issue appropriately and effectively to make campuses safe for **all students**."[35]  (Emphasis added).

48.    The Sexual Violence Prevention Toolkit further directs Defendant NCAA member institutions that they have a duty to all students, not just student-athletes, to protect their communities from sexual violence:

> The origins and perpetuation of sexual violence are embedded at all levels of society; therefore, **to prevent or reduce incidents of sexual violence involving student-athletes and other college students**, and to respond appropriately to them when they occur, require positive culture change that

---

[32] POLICY ON CAMPUS SEXUAL VIOLENCE, *supra* note 27.
[33] NCAA SPORT SCIENCE INSTITUTE, SEXUAL VIOLENCE PREVENTION: AN ATHLETICS TOOL KIT FOR A HEALTHY AND SAFE CULTURE 3 (2d ed. 2019), https://ncaaorg.s3.amazonaws.com/ssi/violence/SSI_SexualViolencePreventionToolkit.pdf (last visited Apr. 27, 2020) [hereinafter SEXUAL VIOLENCE PREVENTION TOOLKIT].
[34] *Id.*
[35] *Id.* at 2.

only will be achieved on college campuses through significant, informed and enduring commitment.[36]  (Emphasis added)

49.    In August 2016, Defendant NCAA Board of Governors appointed a Commission to Combat Campus Sexual Violence ("Commission").

50.    The aspirational goal of the Commission was:

> A positive and thriving athletics team culture that revolves around respect and empathy for all, fostering a climate in which all feel that they are respected, valued and contributing members of their teams, athletics programs and institutions; and creating an environment in which students (**athletes and nonathletes alike**) feel safe and secure, both emotionally and physically, and are free of fears of retaliation or reprisal. The positive culture exuded by a member institution's NCAA teams is the catalyst for a positive culture across an entire campus.[37]  (Emphasis added)

51.    The Commission recommended that Defendant NCAA Board of Governors adopt an Association-wide policy to reinforce the previous efforts of Defendant NCAA to address campus sexual violence.

52.    On August 7, 2017, Defendant NCAA adopted Defendant NCAA Board of Governors' Policy on Campus Sexual Violence.  The policy was updated in August 2018.[38]

53.    In June 2018, the Commission recommended that student-athletes' participation on the field be directly linked to their behavior off the field.[39]

54.    During Defendant NCAA Board of Governors' August 2018 meeting, Defendant NCAA Board of Governors disbanded the Commission without taking up the recommendation of the Commission.[40]

---

[36] *Id.*

[37] *See* POLICY ON CAMPUS SEXUAL VIOLENCE, *supra* note 27.

[38] *Id.*

[39] Kenny Jacoby, *She reported college football players for gang rape. Now she's on a mission.*, USA TODAY (Dec. 16, 2019), https://www.usatoday.com/in-depth/news/investigations/2019/12/12/advocates-push-ncaa-schools-ban-violent-athletes/4379165002/ (last visited Apr. 27, 2020).

[40] *Id.*

55.    During that meeting, Defendant NCAA Board of Governors promised to continue to monitor and track sexual violence issues.[41]

56.    Defendant NCAA Board of Governors stated that its Executive Committee intended to "continue to monitor and track on sexual violence issues [*sic*]" and "follow up with the Board as necessary," according to minutes from its August 2018 meeting.[42]

57.    Upon information and belief, Defendant NCAA Board of Governors has taken no action to address acts of sexual violence committed by its male student-athletes since that August 2018 meeting.[43]

58.    Defendant NCAA is under investigation by the United States Congress for its staggering lack of action and its unwillingness to take accountability for the pervasive problem of sexual violence committed by male student-athletes under its watch.[44]

59.    Congress has taken up the issue of the NCAA-created "predator pipeline" that allows student-athletes accused or found responsible for committing sexual assault or sexual violence to evade responsibility by transferring to other schools, sometimes with no delay whatsoever and with eager recruitment by the receiving school.[45]

---

[41] *Id.*

[42] REPORT OF THE BOARD OF GOVERNORS OF THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION BOARD OF GOVERNORS MEETING AUGUST 7, 2018 5 (2018), https://www.ncaa.org/sites/default/files/Aug2018BOG_Report_20180820.pdf (last visited Apr. 27, 2020) [hereinafter REPORT OF THE BOARD OF GOVERNORS].

[43] Kenny Jacoby, *NCAA Board of Governors to review policies regarding sexual assault amid congressional pressure on 'predator pipeline,'* USA TODAY (Jan. 16, 2020), https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (last visited Apr. 27, 2020).

[44] *Id.*

[45] *Id.*

60.     A USA Today investigation found at least thirty-three (33) athletes since 2014 who have transferred to Defendant NCAA member institutions despite being administratively or criminally disciplined for sexual offenses at a previous institution.[46]

61.     USA Today reported in December 2019 that:

> [t]he NCAA notoriously metes out punishments to student athletes for bad grades, smoking marijuana or accepting money and free meals. But nowhere in its 440-page Division I rulebook does it cite penalties for sexual, violent or criminal misconduct. And unlike the pro leagues, the NCAA has no personal conduct policy and no specific penalties for those who commit sexual assault.[47]

62.     Defendant NCAA Board of Governors has resisted calls by eight U.S. Senators[48] and its own Commission to address the problem in any way.

63.     USA Today reports that "no matter if schools suspend, dismiss or expel athletes for sexual misconduct, NCAA rules provide avenues for them to return to the field on a new team within a year and sometimes immediately."[49]

64.     The USA Today investigation found that "[m]ost schools lack formal background check policies, instead relying on former coaches' words and a questionnaire called a 'transfer tracer' that often fails to capture past disciplinary problems."[50]

65.     Defendants have allowed certain loopholes to persist that allow student-athletes accused of sexual misconduct to circumvent the one and only penalty for those who transfer while

---

[46] Id.

[47] Kenny Jacoby, *Predator Pipeline: NCAA looks the other way as college athletes punished for sex offenses play on*, USA TODAY (Dec. 16, 2019), https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/ (last visited Apr. 27, 2020).

[48] Dennis Dodd, *U.S. Senators ask NCAA to develop a 'uniform policy' on sexual assault*, CBS SPORTS (Aug. 15, 2017), https://www.cbssports.com/college-football/news/u-s-senators-ask-ncaa-to-develop-a-uniform-policy-on-sexual-assault/ (last visited Apr. 29, 2020).

[49] Jacoby, *supra* note 48.

[50] Id.

suspended or expelled — a year of bench time. The loophole allows student-athletes to go to a junior college for a minimum of one semester before returning to a Division I school or transfer to another NCAA school before the discipline takes effect.

66. The USA Today investigation showed that "[r]ecent research has shown that a small fraction of students commit a majority of campus sexual assaults. That makes the practice of bringing athletes previously disciplined for sexual assault onto new campuses an extreme liability."[51]

67. The USA Today investigation also found that:

> [t]he NCAA, meanwhile, employs a nearly 60-member enforcement staff to investigate potential violations of amateurism and academic eligibility rules, weighing in on issues like whether players ate too much pasta at a banquet or if a recruit's father wrongly accepted a razor and shaving cream while on the road. It has suspended athletes' playing privileges for infractions as minor as lying about buying a used mattress from an assistant coach. And it can impose permanent bans for major violations, not only ending players' college sports careers but jeopardizing their scholarships and chances of going pro.[52]

68. On December 19, 2019, U.S. Congressmembers Rep. Donna Shalala and Rep. Ross Spano introduced the Congressional Advisory Commission on Intercollegiate Athletics Act of 2019 ("The CACIA Act").[53]

69. The CACIA Act will establish a two-year independent commission to review, among other issues, "the NCAA's lack of accountability for athletes who commit sexual assault, other serious misconduct, and the practice of transferring to other institutions."[54]

---

[51] *Id.*
[52] *Id.*
[53] H. R. 5528, 116th Cong. (2019).
[54] Kenny Jacoby, *NCAA promises expanded sexual-violence policies*, USA TODAY (Jan. 23, 2020), https://stories.usatodaynetwork.com/predatorpipeline/ncaa-promises-expanded-sexual-violence-policies/ (last visited Apr. 27, 2020).

70.     Rep. Shalala has stated that there is no question that Defendant NCAA should have a personal conduct policy for athletes and strict transfer regulations.[55]

71.     Despite their years of purported efforts to combat sexual violence, Defendants still have no specific penalties for athletes that have committed sexual violence.[56]

72.     Nothing prevents suspended or expelled student-athletes from simply transferring to another Defendant NCAA member institution and continuing to play elsewhere.[57]

73.     Defendants routinely issue harsh punishments against student-athletes who accept payments in exchange for use of their likenesses, or who accept free meals, but they have no specific penalty for student-athletes who commit sexual assault.[58]

74.     Defendants have repeatedly and persistently failed to take any meaningful action to mitigate the severe issue of sexual misconduct perpetrated by male student-athletes against women at their member institutions.

**BACKGROUND FACTS RELATED TO THE MSU PLAINTIFFS**

*Plaintiff Roedel*

75.     Emma Roedel was recruited from her high school to be a member of the MSU women's track team, an NCAA Division I ("DI") team.

---

[55] *Id.*

[56] Kenny Jacoby, *College athletes more likely to be disciplined for sex assault*, USA TODAY (Dec. 16, 2019), https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-athletes-more-likely-disciplined-sex-assault/4379153002/ (last visited Apr. 27, 2020).

[57] *Id.*

[58] Kenny Jacoby, *NCAA president deflects blame on sexual assault* policy, USA TODAY (Dec. 18, 2019), https://www.usatoday.com/story/news/investigations/2019/12/18/ncaa-president-mark-emmert-deflects-blame-sexual-assault-policy/2693095001/ (last visited Apr. 27, 2020).

76.     Roedel started at MSU as a freshman student-athlete in the fall semester of 2016.  As a member of the track team, Roedel was not on scholarship, but she received the traditional collegiate student-athlete benefits.

77.     Roedel was a star athlete in high school and was the first female athlete in the history of the MSU track team to run as a freshman in competition.

78.     The majority of the members of the men's and women's track teams who lived in on-campus housing were housed in the same dormitory on the MSU campus.

79.     On or around March 4 or 5, 2017, at approximately 2:00 a.m., Roedel was asleep in her dorm room when she woke up to John Roe A ("JRA")[59] raping her.

80.     JRA was a student-athlete on the MSU men's track team.

81.     The next morning, Roedel learned from a friend that JRA had taken a photo of her naked except for a bra and distributed the photo via Snapchat to the entire men's and women's track teams. The friend showed the photo to Roedel.

82.     Roedel sent JRA a text message asking him if he remembered what had happened. JRA indicated that he did remember and acknowledged that he sexually assaulted Roedel while she was asleep.

83.     JRA sent the following text messages to Roedel: "I apologize for everything," and "No excuse either way on my part."[60]

84.     On or around Monday, March 7, 2017, Roedel reported the rape and subsequent sexual exploitation to her MSU track coach, "Assistant Coach" ("AC").[61]

---

[59] John Roe A is a pseudonym.
[60] *See* Exhibit 2.
[61] Assistant Coach is a pseudonym.

85.    AC was an assistant coach for both the men's and women's track teams.

86.    AC told Roedel that if she pursued any claims against JRA, no one would like her, and that because Roedel is "pretty," she would become a "distraction."

87.    AC notified the MSU Police Department ("MSUPD") of Roedel's report of sexual assault.

88.    MSUPD took a report from Roedel regarding the incident.

89.    Shortly after Roedel made a report to MSUPD, a group of members of the men's track team confronted Roedel in her dorm room.

90.    The members of the men's track team who came to Roedel's dorm room threatened her if she pursued any charges against JRA.

91.    Roedel declined to press criminal charges against JRA in order to protect herself from harm by the men's track team and from further retaliation.

92.    Roedel also declined to initiate filing a Title IX complaint against JRA with MSU's Office of Institutional Equity ("MSU OIE") because of the state of extreme fear she was in after members of the men's track team threatened her.

93.    Sometime during finals week of the spring 2017 semester,[62] AC met with Roedel to discuss her athletic plans for the following year.

94.    Roedel had always been a sprinter on the MSU track team.

95.    JRA was also a sprinter on the team.

96.    AC stated to Roedel that Roedel was being removed from the sprint squad, which was the section of the team Roedel had always run in.

---

[62] May 1-5, 2017.

97.   AC told Roedel that the reason Roedel was being removed from the sprint squad was because the women's and men's sprint squads practiced together, and Roedel could not be around JRA.

98.   AC told Roedel that she could run distance events if she wanted to since JRA was not a distance runner.

99.   Roedel was a sprinter and not a distance runner.

100.  However, AC told Roedel that since the men's and women's teams practiced together, Roedel was not allowed to practice in the same place as JRA; therefore, Roedel would have to practice distance running separately from the team.

101.  AC did not offer Roedel the option for JRA to practice separately.

102.  AC put a discriminatory and unlawful burden on Roedel to separate herself from her rapist.

103.  The entire MSU track team coaching staff was aware that Roedel is a sprinter and not a distance runner.

104.  AC also told Roedel that Roedel had the choice of either of these two courses of action or she could transfer to another school.

105.  AC also told Roedel that there would be no further investigation into JRA, and that he would be permitted to stay on the team. It was only Roedel who was made to leave the team.

106.  Roedel, having no other choice, transferred to Grand Valley State University ("GVSU") so that she could continue to pursue her love of running on the track team there.

107.  Eventually, Roedel quit the track team at GVSU as she found that her experiences at MSU had destroyed her love of running.

108.    As a direct and indirect result of Defendants' actions and inactions, Roedel has suffered severe emotional and physical distress, including but not limited to Post-Traumatic Stress Disorder ("PTSD"), depression, anxiety, and ongoing sleep disturbances that have impacted her ability to function.

**Plaintiff Kowalski**

109.    In April 2015, Bailey Kowalski was an 18-year-old student in her first year at MSU with the lifelong dream of becoming a sports journalist.

110.    John Roe B, John Roe C, and John Roe D ("JRB," "JRC," and "JRD")[63] were all MSU student-athletes who played on the MSU basketball team.

111.    On the evening of April 11, 2015, Kowalski was raped by JRB, JRC, and JRD at JRC's apartment.

112.    After the rapes, Kowalski's friend took her to the MSU Counseling Center ("MSUCC"), where Kowalski reported the rapes to a counselor and completed an initial intake and assessment.

113.    When Kowalski disclosed to the counselor that her rapists were notable MSU athletes on the men's basketball team, the counselor's demeanor completely changed, and she announced to Kowalski that she needed another person in the room.

114.    Another person came into the room. Kowalski did not understand who this additional person was or why they were brought in.

115.    MSUCC staff told Kowalski that her options were either to file a police report or deal with the aftermath of the rapes on her own.

---

[63] John Roe B, John Roe C, and John Roe D are pseudonyms.

116.    MSUCC staff made clear to Kowalski that if she chose to notify the police, she faced an uphill battle that would create anxiety, unwanted media attention, and publicity, as had happened with many other female students who were sexually assaulted by well-known MSU athletes.

117.    MSUCC staff made comments like, "We have had many other students in the same situation who have reported, and it has been very traumatic for them."

118.    MSUCC staff told Kowalski that they had seen "a lot of these cases" with "guys with big names" and the best thing to do is to "just get yourself better," implying to Kowalski that it would not be in her best interest to report the incident to law enforcement.

119.    MSUCC staff told Kowalski, "If you pursue this, you are going to be swimming with some really big fish."

120.    MSUCC staff did not advise Kowalski to seek testing for sexually transmitted infections or pregnancy, a Sexual Assault Nurses Examination ("SANE"), a physical examination, medical treatment, or any other type of examination or evidence collection.

121.    Kowalski was so discouraged by MSUCC staff's statements and representations that she became frightened to the point that she decided she could not report the rapes to law enforcement.

122.    MSUCC staff also failed to notify Kowalski of her option to report the rapes to the MSU Title IX office.[64]

---

[64] MSU's Title IX office was housed in the Office for Inclusion and Intercultural Initiatives ("MSU I3") prior to May 2015, and in the Office of Institutional Equity ("MSU OIE") starting in May 2015.

123. No MSU staff ever notified Kowalski of her rights and protections as an individual experiencing sex discrimination under Title IX or Michigan's Elliott-Larsen Civil Rights Act.

124. No MSU staff ever notified Kowalski of her right to seek interim measures, accommodations, and no-contact directives under Title IX and MSU policy.

125. After the assault, Kowalski saw her attackers in her dorm cafeteria, causing her to experience panic attacks and flashbacks.

126. Kowalski lived in fear every day that she would see her rapists.

127. No MSU staff ever notified Kowalski of her right to seek a no-contact directive to keep her rapists out of her dorm and/or her dorm cafeteria.

128. In October 2015, Kowalski became so traumatized, depressed, and withdrawn due to her rapes and MSU's failure to respond appropriately that she was admitted to the Sparrow Hospital outpatient psychiatric day program in Lansing, Michigan, for intensive psychiatric treatment.

129. Kowalski eventually stopped being able to attend her classes and was forced to withdraw from MSU for the semester in fall 2015.

130. After disclosing her rapes and subsequent emotional trauma to MSU officials with authority to approve her withdrawal from classes and refund her tuition for the semester, MSU staff again failed to inform Kowalski of her rights to academic assistance, to file a complaint with MSU I3 or MSU OIE, to file a complaint with the U.S. Department of Education Office for Civil Rights, to seek a no-contact directive, and any other rights or protections she had as an individual who had experienced sex discrimination on campus.

131.   MSU staff failed to inquire of Kowalski as to what assistance she might need upon returning to MSU the following semester.

132.   In January 2016, Kowalski resumed classes at MSU.

133.   Kowalski changed her major, as her dream of becoming a sports journalist had been destroyed by her rapes by student-athletes.

134.   In February 2016, Kowalski sought counseling at the MSU Sexual Assault Program ("MSU SAP").

135.   MSU SAP failed to inform Kowalski of her rights to academic assistance, to file a complaint with MSU I3 or MSU OIE, to file a complaint with the U.S. Department of Education Office for Civil Rights, to seek a no-contact directive, and any other rights or protections she had as an individual who had experienced gender discrimination on campus.

136.   As a direct and indirect result of Defendants' actions and inactions, Kowalski has suffered severe emotional and physical distress; sought private counseling and psychiatric treatment; and been prescribed multiple medications to treat her diagnoses of PTSD, depression, anxiety, panic attacks, and insomnia.

*MSU and the NCAA*

137.   Upon information and belief, MSU has fostered a culture in which female victims are discouraged from reporting sexual assaults, sexual harassment, stalking, and other forms of sex discrimination when those acts are perpetrated by male student-athletes in order to protect MSU, the male athletics programs, male student-athletes, and the NCAA, at the expense of the female victims.

138.    Discouraging female victims from reporting acts of gender discrimination committed by male athletes plausibly creates an environment where male athletes can sexually assault women without repercussion.

139.    MSU has been under significant public scrutiny regarding its handling of reports of sexual misconduct, especially as they relate to MSU athletics.

140.    In recent years, MSU has been under investigation by the Michigan Attorney General, the Michigan Legislature, U.S. Congress, the U.S. Department of Education's Office for Civil Rights and its Federal Student Aid Division, and the NCAA itself.

141.    Upon information and belief, Defendants have been fully aware of MSU's acts and omissions regarding a failure to address gender discrimination on its campus, including sexual violence perpetrated by its male student-athletes.

142.    Defendants have repeatedly failed to take any action to address MSU's violations of Defendant NCAA's policies, procedures, and guidelines regarding gender discrimination.

**BACKGROUND FACTS RELATED TO THE UNL PLAINTIFFS**

*Plaintiffs Davis and Jane Doe 1*

**Plaintiff Davis**

143.    In fall 2017, Capri Davis was in her senior year as a star volleyball player at Lake Ridge High School in Mansfield, Texas.  Davis was named an Under Armour first-team All-American player and was ranked the number 21 overall prospect by PrepVolleyball.com during her senior year of high school.  Davis led the Lake Ridge Eagles to the Texas 5A Regional Girls' Volleyball Quarterfinals and was known nationally as a promising, up-and-coming elite women's volleyball prospect.

144.   Davis had her choice of schools to attend after high school and received multiple athletic scholarship offers from a number of schools.

145.   UNL's women's volleyball team is known nationally as one of the best in the country. The team has won five NCAA women's volleyball national championships, including two in the past five years.

146.   At the end of the 2019 season, UNL's women's college volleyball team was ranked fifth in the nation by the American Volleyball Coaches Association.

147.   UNL offered Davis a full athletic scholarship and successfully recruited her to play for the UNL women's volleyball team.

148.   In or around November 2017, Davis signed a Letter of Intent, committing to attend UNL and play on the Huskers women's volleyball team.

149.   Davis began her freshman year at UNL in August 2018.

**Plaintiff Jane Doe 1**

150.   Jane Doe 1 ("JD1") began her freshman year as a student at UNL in August 2018.

151.   On or around August 17, 2018, JD1 was raped by two male student-athletes on the UNL football team, "John Roe E" ("JRE") and "John Roe F" ("JRF").[65]

152.   At that time, JD1 chose not to report the rapes as she had just started her college career and wanted to try to forget what had happened and move on.

**<u>Sexual Assault of Plaintiffs Davis and Jane Doe 1</u>**

153.   In or around March or April 2019, Davis and JD1 were at a party with several other friends.

---

[65] John Roe E and John Roe F are pseudonyms.

154. JRE and another male student-athlete on the football team, John Roe G ("JRG"),[66] appeared at the party and approached Davis and JD1, placed their hands on the women's buttocks, and groped them without their consent.

155. In or around April 2019, Davis and JD1 called UNL's Title IX office, the Office of Institutional Equity and Compliance ("UNL IEC"), to report JRE and JRG groping their buttocks.

156. No investigation was initiated at that time and Davis and JD1 did not hear from UNL IEC again.

157. At around that time, Davis also spoke with a teacher about the sexual assaults.

158. Davis's teacher told her that she was a responsible employee under UNL's Title IX policy and advised Davis that she was obligated to report the information to UNL IEC pursuant to that policy.

159. Neither Davis nor JD1 received any contact from UNL IEC after that report.

160. In or around August 2019, Davis and JD1 learned that JDE and JDG had been accused of rape by a female UNL student.

161. Davis and JD1 decided to attempt to report their sexual assaults to UNL IEC for a third time.

162. In or around September or October 2019, Davis, JD1, and their friend who witnessed the groping incident went to UNL IEC to make a report.

163. In or around October 2019, UNL IEC initiated an investigation into Davis and JD1's report of sexual assault by JRE and JRG at the party.

---

[66] John Roe G is a pseudonym.

164. In October 2019, Davis, JD1, JD2, and several other friends attended a Halloween party off campus.

165. The group would not have attended the party had they known their assailants would be in attendance.

166. At the party, JRE and JRG came up to Davis and JD1 and began yelling at them, sexually harassing them, and threatening them for reporting them to UNL IEC.

167. Davis and JD1 were able to escape from JRE and JRG before anything further happened and fled the party.

168. In or around late October or early November 2019, Davis and JD1 reported this incident of further sexual harassment and retaliation to both UNL IEC and the Lincoln Police Department ("LPD").

169. Both UNL and the U.S. Department of Education have policies prohibiting retaliation in Title IX investigations.

170. UNL IEC staff did not investigate the incident, even though it was clearly retaliatory and in violation of UNL's Title IX policy.

171. Neither Davis nor JD1 ever heard anything further from UNL about the retaliation incident they had reported.

172. Throughout the course of the Title IX investigation into the groping, UNL IEC staff repeatedly communicated only with JD1, and did not communicate with Davis.

173. No explanation was provided to Davis regarding why she was not receiving the same communications as JD1, even though both were named as claimants in the investigation.

174.   In or around November or December 2019, JD1 and Davis were notified by UNL that they needed to attend a meeting with a UNL IEC employee and a student conduct officer regarding the incident in which JRE and JRG groped their buttocks.

**Additional Background Regarding Plaintiff Jane Doe 1 and Her Damages**

175.   At that meeting, the UNL IEC employee asked JD1, "Have you ever had sexual relations with [JRE], [JRF], or [JRG]?"

176.   Although she did not want to talk about the rapes, JD1 also did not want to lie, so she told the UNL IEC employee that JRE and JRF had raped her in August 2018.

177.   Within a week of that meeting, JD1 went into the UNL IEC office and requested that they initiate a Title IX investigation into JRE and JRF's rapes of her in August 2018.

178.   A UNL IEC employee interviewed JD1 and JD1 provided a full account of the rapes.

179.   JD1 stopped enjoying most social outings because she didn't want to run into her assailants or any of their friends.

180.   JD1 began meeting regularly with an advocate from the UNL Center for Advocacy, Response, & Education ("CARE") who provided her with emotional support and information about the UNL Title IX investigation process.

181.   The CARE advocate connected JD1 with a mental health therapist.

182.   JD1 felt unsafe and uncomfortable on campus and experienced headaches, nausea, and a lack of focus.

183.   On December 5, 2019, JD1 received a letter from UNL IEC informing her that no finding was being made against JDE or JDG in the investigation into the buttocks groping incident.

184.   UNL IEC never provided Davis or JD1 an opportunity for a hearing or an opportunity to cross-examine JDE or JDG.

185. In early January 2020, a UNL IEC employee contacted JD1 to ask her some follow up questions in the ongoing investigation regarding her rapes by JRE and JRF.

186. During that call, JD1 asked the UNL IEC employee if the rapes of other students by JRE and JRF could be considered in her ongoing investigation with respect to the credibility of JRE and JRF.

187. The UNL IEC employee initially said, "I don't know.  It might be a privacy concern."

188. The UNL IEC employee told JD1 she was going to meet with a lawyer to determine whether that information could be considered.

189. Later, the UNL IEC employee told JD1 that JRE and JRF's rapes of other students would not be considered in her investigation.

190. JD1 told the UNL IEC employee that she had a class with JDG.

191. UNL did not offer JD1 any accommodations or interim measures, such as removing JRG from the class or allowing JD1 to participate in the class remotely or switch sections.

192. On January 14, 2020, JD1 received a letter from UNL IEC informing her that no finding was being made against JRE or JRF in the rape investigation.

193. UNL IEC never provided JD1 an opportunity for a hearing or an opportunity to cross-examine JDE or JDF.

194. JD1 decided not to attempt to file an appeal in either case, as she had heard from other female students that no one was ever successful in appealing a UNL IEC finding.

195. As a direct and indirect result of Defendants' actions and inactions, JD1 has suffered severe emotional and physical distress, including but not limited to depression, anxiety, panic attacks, social withdrawal, headaches, nausea, and lack of focus.

**Additional Background Regarding Plaintiff Davis, Further Gender Discrimination She Suffered, and Her Damages**

196.     In or around September 2019, Davis became overcome with depression and anxiety.

197.     In or around October 2019, Davis began considering whether to take a mental health redshirt, meaning that she would suspend her participation on the women's volleyball team for the year in order to extend her eligibility to play with Defendant NCAA, as Defendant NCAA has strict rules about student-athlete eligibility.

198.     Davis decided to take the redshirt and withdrew from the UNL volleyball team.

199.     Soon after Davis withdrew from the volleyball team, a rumor started that Davis was pregnant and that a friend of hers who was a male student-athlete on the football team, "Mike Loe,"[67] was the father.

200.     The rumor was not true.

201.     Davis did not know who started the rumor.

202.     The rumors were so widespread that they were well-known within the UNL community as well as communities across the country and online that followed either the UNL women's volleyball or men's football programs.

203.     Media and communications staff at UNL advised Davis that she should address the pregnancy rumors.

204.     Upon information and belief, no UNL staff advised Mike Loe to address the pregnancy rumors.

205.     The burden to address the pregnancy rumors was placed solely on the shoulders of Davis, the female student-athlete.

---

[67] Mike Loe is a pseudonym.

206.    On November 4, 2019, at UNL staff's suggestion, Davis posted the following message on her Twitter account: "thank you for the concerns for my health this season but just so we're clear, i will not be expecting ANYBODYS child any time soon ;)".[68]

207.    No one from UNL ever reached out to Davis to ask her if she wanted to initiate a Title IX investigation regarding the sexual harassment she was experiencing as a result of the rampant false pregnancy rumors.

208.    No one from UNL ever interviewed Davis about the sexual harassment.

209.    No one from UNL ever offered Davis any accommodations, interim measures, or supports after the pregnancy rumors began tearing through the campus community.

210.    Davis stopped showing up on campus after she redshirted for the season because walking around the UNL athletic facilities surrounded by all the male athletes who supported their teammates was unbearable for her.

211.    Davis's grades began to slip because she was not able to go to class.

212.    Davis also became less social and more withdrawn and she stopped socializing to the extent that she had previously.

213.    Previously, Davis had been extremely friendly and had good relationships with all the facilities staff at UNL.

214.    After going through this experience, Davis withdrew and stopped being open with people.

215.    Davis also feared retaliation and physical assault by friends of the male athletes, after the attack on Jane Doe 2 (outlined later in this complaint).

---

[68] *See* Exhibit 3.

29

216. Davis fell into depression due to the onerous Title IX process, the rampant sexual harassment, and the lack of support from anyone at UNL other than her coaches and athletic staff.

217. Eventually, Davis decided she could no longer remain at UNL.

218. On December 16, 2019, Davis publicly announced that she had signed with and was transferring to the University of Texas to attend school and play on the women's volleyball team in Austin.

219. Davis left UNL at the end of the semester in December 2019 and began attending the University of Texas the following semester in January 2020.

220. Davis told her coaches at the University of Texas that she was terrified to be around male athletes and even considered moving out of the dorms to avoid them.

221. Davis was never advised by UNL of the outcome of the UNL IEC complaint and investigation she and JD1 had initiated against JRE and JRF.

222. Davis was never advised by UNL of her appeal rights in that investigation.

223. Davis heard from JD1 that there had been no finding in the IEC investigation in or around January 2020.

224. To this day, Davis feels nervous around male student-athletes and tries to avoid them.

225. As a direct and indirect result of Defendants' actions and inactions, Davis has suffered severe emotional and physical distress, including but not limited to diagnoses of severe anxiety and depression, being forced to change schools and move across the country, spending days at a time in bed, losing a significant amount of weight, loss of appetite, and nightmares.

*Plaintiff Jane Doe 2*

226.    Jane Doe 2 ("JD2") began her career as a student at UNL in August 2018.

227.    JD2 started her freshman year excited to go out and meet new people.

228.    In or around December 2018, several months into her freshman year, JD2 was raped by two male students, "John Roe H" ("JRH") and John Roe I ("JRI"),[69] in an on-campus dormitory.

229.    JD2 went to the emergency room at a local hospital where she was administered a SANE kit.

230.    JD2 was also contacted by the UNL Police Department ("UNLPD") regarding the rape.

231.    After talking to UNLPD, JD2 was contacted by a UNL IEC staff member, who left her a voicemail.

232.    JD2 was dealing with significant emotional distress after the rape and decided she did not want to move forward with the reporting process with either UNLPD or UNL IEC.

233.    JD2 was friends with JRG, referenced earlier in this complaint.

234.    In or around February 2019, JD2 was in JRG's dorm room spending time with him as friends.

235.    Although JD2 and JRG were just friends, JRG began kissing JD2 without her consent, and eventually raped her.

236.    Initially, JD2 did not report the rape to anyone.

237.    In or around August 2019, JD2 learned via news reports that another female UNL student, "Sherry Moe,"[70] alleged that she had been raped by JRG.

---

[69] John Roe H is a pseudonym.
[70] Sherry Moe is a pseudonym.

238. At that time, because JD2 learned that JRG may have sexually assaulted other people, she decided to make a report to LPD.

239. JD2 was close friends with Davis and JD1 and had seen firsthand how harmful and destructive the UNL Title IX investigation process was to them.

240. JD2 also spoke to Sherry Moe, who told her that she was going through a UNL Title IX investigation through UNL IEC after reporting her rape by JRG.

241. Sherry Moe told JD2 that UNL IEC had confused her with another student and had sent emails and confidential information about her investigation and rape to another student who had the same first name as Sherry Moe, but a different last name.

242. Due to the harm she saw Davis and JD1 suffering, and the negative information about the UNL Title IX process she learned from Sherry Moe, JD2 decided not to report her second rape to UNL IEC, because she was afraid it would negatively impact her ability to continue her studies at UNL, as well as her mental and emotional health.

243. Due to the sexual assaults she had experienced, JD2 became nervous to the point of paranoia at times.

244. JD2 became much less social and became afraid of going to parties or other social events.

245. JD2 has developed a fear of men and male friends because JDG had been her friend prior to raping her.

246. JD2 understood from her friends' accounts that the UNL Title IX reporting and investigation process was even more harmful to them than the rapes themselves had been and she did not want to subject herself to that.

247.  In or around October 2019, JD2 was at a Halloween party with JD1, Davis, and another friend, "Mary Poe."[71]

248.  When JD2 learned that the party was also a birthday party for JRE, she and Mary Poe decided to leave the party.

249.  While JD2 and Mary Poe were trying to leave, JRG's girlfriend, "Terri Coe,"[72] walked up to Mary Poe and punched her.

250.  Mary Poe continued walking and was able to escape Coe's attack.

251.  Terri Coe then turned her attention to JD2.

252.  Terri Coe grabbed JD2's hair and began punching her.

253.  Terri Coe punched JD2 approximately fifteen (15) to twenty (20) times.

254.  Terri Coe then pushed JD2's head down and shoved her against a car.

255.  JD2 was eventually able to escape Terri Coe and reported her attack to LPD.

256.  JD2 was then admitted to the emergency room at a local hospital for a concussion.

257.  JD2 believed Terri Coe's attack on her was retaliatory because she had reported Terri Coe's boyfriend JRG to LPD.

258.  JD2 reported this retaliation to UNL IEC, and they refused to investigate it.

259.  After making the report to UNL IEC, JD2 began to experience a loss of friends and relationships, because her former friends were angry with her for reporting their friends and teammates.

260.  JD2 became afraid to even be on UNL's campus due to these concerns of retaliation.

---

[71] Mary Poe is a pseudonym.
[72] Terri Coe is a pseudonym.

261. JD2 grew up as a lifelong UNL Husker football fan, and prior to the rape by JDG, she attended every football game her freshman year.

262. After JDG raped her, JD2 stopped going to most UNL football games and she is uncomfortable even hearing people talk about the football team.

263. The rape, retaliation, and subsequent inactions by Defendants caused a rift between JD2 and her family, as she has been unable to tell her family what happened due to fear of how it would affect them.

264. JD2's grades dropped significantly after Terri Coe attacked her and retaliated against her, as she began to fully grasp the lack assistance and support available to her at UNL as a survivor of rape and Title IX retaliation.

265. As a direct and indirect result of Defendants' actions and inactions, JD2 has suffered severe emotional and physical distress, including but not limited to depression, anxiety, panic attacks, and sleeplessness.

### *Plaintiff Thomas*

266. In August 2015, Sheridan Thomas had been accepted to and was preparing to begin her freshman year as a student at UNL.

267. August 12, 2015 was "fan day," when students would normally socialize and meet each other in preparation for the coming athletic season.

268. That day, Thomas accompanied a friend to meet some student-athletes with whom her friend was acquainted. They gathered in the dorm room of one of the student-athletes, in the residence building Cather Hall.

269. The student-athletes, "John Roe J" ("JRJ") and "John Roe K" ("JRK"),[73] procured alcohol for the group to drink.

270. Thomas did not normally drink alcohol, so the alcohol she consumed had a rapid and substantial effect on her.

271. Thomas told her friend that she wanted to leave.

272. Thomas' friend told Thomas to lie down because Thomas had been drinking and shouldn't drive.

273. Thomas lay down on JRJ's bed.

274. JRJ then went to his bed and lay down next to Thomas.

275. Though Thomas was trying to sleep, JRJ began to touch Thomas' genitals and breasts. JRJ then raped Thomas.

276. Thomas eventually escaped JRJ and went to her friend and JRK and started crying

277. Thomas told her friend and JRK that JRJ had raped her.

278. Thomas and her friend then escaped the dorm room.

279. Thomas was terrified and wanted to report the incident to the police, but Thomas' friend talked her out of it because she was afraid they would get in trouble for drinking alcohol underage.

280. Thomas started receiving harassing text messages from JRJ and JRK later that night talking about the size of JRJ's penis, which was clearly unwelcome to Thomas, and constituted sexual harassment.

---

[73] John Roe I and John Roe J are pseudonyms.

281.    Thomas started classes at UNL the following Monday, August 17, 2015, in a state of extreme fear, depression, and shock from the rape and subsequent sexual harassment.

282.    For Thomas, the beginning of her time at UNL was a blur, and she felt like a zombie.

283.    On or around September 18, 2015, Thomas felt unable to cope any longer, so she sought sexual assault counseling assistance from the UNL on-campus advocacy organization Voices of Hope after seeing a flyer advertising their services in the student union.

284.    Thomas began missing class due to her emotional and mental state.

285.    On or around November 6, 2015, Thomas met with UNL IEC and requested assistance withdrawing from a class.

286.    UNL IEC staff told Thomas that UNL IEC would not assist her with the academic accommodation unless she filed a complaint against JRJ and initiated a formal Title IX investigation against him.

287.    Thomas was terrified of initiating the Title IX investigation process and withdrew her request for assistance from UNL IEC.

288.    In December 2015, Thomas began counseling to help her address the emotional and psychological damage of the rape.

289.    On or around December 16, 2015, Thomas met with the UNL Dean of Students to discuss withdrawing from one of her classes.

290.    Thomas told the Dean of Students the details of her rape and detailed for him the difficulties she had been having in school as a result of the immense trauma, stress, and Post-Traumatic Stress Disorder-like symptoms she was experiencing as a result of the rape.

291.    The Dean of Students granted Thomas late withdrawal from one of her classes after this meeting.

292.   The Dean of Students did not offer Thomas any other assistance, services, or interim measures.

293.   The Dean of Students did not advise Thomas that JRJ's assault of her was a potential violation of Title IX, university policy, and the Nebraska State Constitution or that JRJ could face discipline for raping her.

294.   On or around January 22, 2016, Thomas made an anonymous report of her rape to UNLPD.

295.   On or around January 29, 2016, Thomas decided she was willing to identify herself as the victim in the criminal matter and met with her counselor from Voices of Hope and a detective from UNLPD to discuss reporting options.

296.   On that same day, Thomas also decided she wanted to move forward with a Title IX investigation with UNL IEC regarding JRJ's violations of UNL's Title IX policy and Student Code of Conduct.

297.   On or around February 12, 2016, Thomas had a formal interview with UNLPD to provide her statement for the criminal investigation.

298.   On that same day, Thomas also met with UNL IEC staff to be interviewed for the Title IX investigation.

299.   Thomas told UNL IEC staff that JRJ had groped her, kissed her, and raped her, all without her consent and while she repeatedly told him, "No."

300.   Thomas told UNL IEC staff that JRJ had repeatedly called and texted her after the rape, against her wishes, and that his texts included unwelcome sexual content.

301.   Thomas told UNL IEC staff that she had several witnesses she wanted them to interview in the course of the investigation, who were friends she had talked to in the immediate

aftermath of the rape who could share contemporaneously observed information about Thomas' account and demeanor.

302. UNL IEC never interviewed Thomas' witnesses.

303. Thomas also received a notification letter from UNL IEC advising her that the investigation was not going to be completed within the UNL Title IX policy's timeline of sixty (60) days but the letter did not provide a reasonable rationale for the delay.

304. UNLPD told Thomas that JRJ had initially admitted to the rape, then changed his story and said they had engaged in consensual sex, then changed his story another time and said he and Thomas had performed oral sex on one another.

305. On or around March 11, 2016, the UNLPD investigation was concluded and no charges were filed against JRJ.

306. On or around April 22, 2016, Thomas received a letter from UNL IEC stating that IEC "determined [JRJ's] version of events surrounding the parties' interaction on the bed aligns more closely with the evidence provided by the parties."

307. UNL IEC never gave Thomas an opportunity for a hearing or any opportunity to cross-examine JRJ.

308. The April 22 letter from UNL IEC was riddled with factual errors and discriminatory statements.

309. The letter provided no explanation or rationale as to why UNL IEC found JRJ more credible than Thomas.

310. The letter also stated the following: "…it is advised that you continue to refrain from contact with [JRJ]…," putting a discriminatory and unlawful burden on Thomas to separate herself from her rapist.

311.   The letter contained none of the information Thomas had shared about JRJ's repeated unwelcome and sexually harassing texts and calls and contained no analysis as to whether JRJ had engaged in sexual harassment or stalking directed at Thomas.

312.   The letter contained no evidence that UNL IEC had interviewed any of the witnesses Thomas had named, and her friends told her that they had not been contacted for an interview.

313.   Thomas filed an appeal of the finding in the April 22 letter, challenging the multiple factual errors in the letter.

314.   On or around May 2, 2016, Thomas again met with the Dean of Students to request late withdrawal from a Spanish class due to her concerns about her grades slipping as a result of the stress and anxiety she was suffering from both the sexual assault itself as well as the protracted, difficult, and flawed Title IX investigation process.

315.   The Dean of Students granted Thomas' request for a late withdrawal from the Spanish class.

316.   The Dean of Students assured Thomas that she would not be academically dismissed from UNL regardless of her withdrawal from the Spanish class.

317.   On or around May 13, 2016, Thomas met with other UNL staff, including UNL's Title IX appeal officer, to discuss her appeal of the UNL IEC determination.

318.   On or around May 17, 2016, Thomas met again with the appeal officer to discuss the appeal process and request an appeal hearing.

319.   The appeal officer notified Thomas that she was denying her the opportunity for an appeal hearing.

320. The appeal officer refused to allow Thomas a hearing on her appeal and told Thomas the appeal officer would be making a decision on Thomas's appeal herself without a hearing.

321. The appeal officer provided no rationale or explanation for her denial of a hearing to Thomas.

322. On or around June 7, 2016, Thomas met with the appeal officer, who notified her that she was denying Thomas' appeal.  The appeal officer provided Thomas with a letter notifying her of the decision.

323. The appeal officer's June 7 letter denying Thomas's appeal addressed the false statements as Thomas had challenged them but did not alter the finding that JRJ had not violated any University policy.

324. The appeal officer's June 7 letter is filled with erroneous and incomprehensible statements and is difficult to decipher.

325. UNL's policies did not provide for any further avenues for appeal of the erroneous finding by UNL IEC.

326. Most shockingly, while Thomas was going through the Title IX appeal process, she was academically dismissed from UNL.

327. On May 14, 2016, Thomas received an email from the UNL University Registrar, informing her that she had been academically dismissed from UNL – even though the Dean of Students had promised her that this would not happen when she met with him less than two weeks prior.

328. As Thomas had repeatedly explained to UNL officials, her poor academic performance directly resulted from the emotional, psychological, and physical damage the rape caused her.

329.  Thomas was devastated by her dismissal from UNL, with no chance to re-enroll for at least a year, and with daunting restrictions on her ability to be readmitted.

330.  After learning she had lost her appeal of the UNL IEC finding in her Title IX case, Thomas lost all hope.

331.  For those reasons, because her mother believed UNL was too dangerous and that Thomas would not be safe there, Thomas did not return to UNL.

332.  Thomas fell into a deep depression, began consuming alcohol to cope, and lost her sense of purpose in life.

333.  Thomas eventually decided not to attempt to get a college education anywhere.

334.  As a direct and indirect result of Defendants' actions and inactions, Thomas has suffered severe emotional and physical distress, including but not limited to emotional and physical distress including PTSD, alcohol abuse, depression, and anxiety, and she was forced to abandon not only her career as a student at UNL, but her dreams of attending and graduating from college altogether.

*UNL and the NCAA*

335.  Upon information and belief, UNL has fostered a culture in which female victims are discouraged from reporting sexual assaults, sexual harassment, stalking, and other forms of gender discrimination when those acts are perpetrated by male student-athletes in order to protect UNL, the male athletics programs, male student-athletes, and the NCAA, at the expense of the female victims.

336.  Discouraging female victims from reporting acts of gender discrimination committed by male athletes plausibly creates an environment where male student-athletes can sexually assault women without repercussion.

41

337. UNL has been under scrutiny regarding its handling of sexual assault cases, especially as they relate to UNL athletics.

338. UNL was the first university in the nation to have a sexual assault-related Title IX lawsuit filed against it by a female student who was raped by a male student-athlete.[74]

339. UNL has recently been named in several gender discrimination-related lawsuits, one filed by the longest-serving female professor at UNL alleging unequal pay based on gender[75] and a second by a female student alleging Title IX violations after she reported being sexually assaulted by a male student.[76]

340. Upon information and belief, UNL does not require its students to go through comprehensive training on its Title IX policy and its definitions, leaving students at risk of not understanding when their rights have been violated or when they may be engaging in behaviors that are in violation of UNL policy.

341. In April 2020, UNL expelled JRE and JRG for their rapes of another female student at UNL other than those named in this complaint.[77]

---

[74] Grace Gorenflo, *UNL alumna, sexual assault survivor fights athletic power in Title IX cases*, THE DAILY NEBRASKAN (Dec. 2, 2019), http://www.dailynebraskan.com/news/unl-alumna-sexual-assault-survivor-fights-athletic-power-in-title-ix-cases/article_9466fb5c-156f-11ea-9d84-071ea9154f79.html (last visited Apr. 27, 2020).

[75] Rick Ruggles, *Longtime law professor Josephine Potuto sues, says NU pays women less*, OMAHA WORLD-HERALD (Nov. 19, 2019), https://www.omaha.com/news/state_and_regional/longtime-law-professor-josephine-potuto-sues-says-nu-pays-women/article_08ff19b5-d2ec-5dd2-b05f-6edbb740a9a0.html (last visited Apr. 27, 2020).

[76] Chris Dunker, *Lawsuit: UNL acted with 'deliberate indifference' in investigating reported sexual assault*, THE LINCOLN JOURNAL-STAR (Mar. 2, 2020), https://journalstar.com/news/local/crime-and-courts/lawsuit-unl-acted-with-deliberate-indifference-in-investigating-reported-sexual-assault/article_4bb26473-a40c-524d-b0d1-a51ab7949995.html (last visited Apr. 27, 2020).

[77] Paula Lavigne, *Nebraska expels two former Cornhuskers after violations of the school's sexual misconduct policy*, ESPN (Apr. 6, 2020), https://www.espn.com/college-football/story/_/id/29002689/nebraska-expels-two-former-cornhuskers-violations-school-sexual-misconduct-policy (last visited Apr. 27, 2020).

342. In 2014, the University of Nebraska Board of Regents entered into a resolution agreement with the U.S. Department of Education's Office for Civil Rights with respect to complaint(s) filed against the institution with respect to its response to complaints of gender discrimination and/or sexual violence.

343. Upon information and belief, Defendants have been fully aware of UNL's acts and omissions regarding a failure to address gender discrimination on its campus, including sexual violence perpetrated by its male student-athletes.

344. Defendants have repeatedly failed to take any action to address UNL's violations of Defendant NCAA's policies, procedures, and guidelines regarding gender discrimination.

### BACKGROUND FACTS RELATED TO PLAINTIFF JANE DOE 3

*Plaintiff Jane Doe 3*

345. In September 2019, Jane Doe 3 ("JD3") was in her second year, and a junior academically, at an NCAA Division I member institution in the America East Conference ("AEC School" or "AECS").[78]

346. JD3 was recruited to AECS to compete on the swim team as a scholarship athlete.

347. On Saturday, September 7, 2019, JD3 was raped by a male AECS student-athlete on the basketball team, "John Roe L" ("JRL").[79]

348. JD3's friends and teammates began having concerns about her because she was acting suicidal, and five of them submitted anonymous reports about the rape to the AECS Dean of Students Office via the school's online reporting system.

349. In early October 2019, JD3 disclosed the rape.

---

[78] America East Conference School is a pseudonym.
[79] John Roe K is a pseudonym.

350. On October 7, 2019, JD3 met with a campus victim advocate to talk about the rape. The campus victim advocate advised JD3 of her right to initiate a formal Title IX investigation and her right to report to the police.

351. On October 15, 2019, JD3 met with the campus victim advocate again to move forward with filing a formal Title IX complaint against JRL.

352. The victim advocate contacted the AECS Title IX office and notified their staff that JD3 wanted to report a sexual assault.

353. On October 16, 2019, an AECS Title IX office staff member reached out to JD3.

354. On October 17, 2019, JD3 met with Title IX staff for an initial interview in the Title IX process.

355. At that meeting, the AECS Title IX investigator told JD3 that she also had the option of informal resolution of her Title IX complaint, but that if she chose that option, consequences or discipline would not be possible against JRL.

356. JD3 advised the AECS Title IX investigator that she wanted to pursue the formal Title IX investigation process.

357. Later that day, JD3 advised her coaches and members of athletic administration, including the Director of Athletics, of her decision to proceed with a formal Title IX investigation against JRL.

358. Later that day, the AECS Title IX investigator called JD3 and urged her to "reconsider" whether she wanted to pursue the informal Title IX resolution process.

359. On October 18, 2019, at AECS's insistence, JD3 again met with AECS Title IX staff, as well as an AECS athletics staff member.

360.    At that meeting, AECS staff told JD3 that the informal Title IX resolution process could involve sanctions for JRL, including possible game suspension, mandatory counseling, and listening to JD3 give a victim impact statement directly to him.

361.    Based on that information, JD3 decided to move forward with the informal Title IX resolution process.

362.    On November 4, 2019, JD3 met with an external attorney, "Jimmy McGill,"[80] who had been hired by AECS.

363.    AECS told JD3 that Jimmy McGill's purpose was to "mediate the process without bias."

364.    At that meeting, Jimmy McGill told JD3 that mandatory counseling and game suspensions were "not legally allowed" via the school's informal Title IX resolution process.

365.    Jimmy McGill also told JD3 that it was "against university policy" for her to make a victim impact statement to JRL face-to-face.

366.    Jimmy McGill told JD3 that she could make a victim impact statement to JDK via an online streaming service, such as Zoom or Skype.

367.    Jimmy McGill also told JD3 that he felt as though she "had a very solid case" for the formal Title IX investigation process.

368.    Jimmy McGill told JD3 he was sorry and "felt bad" that AECS had "dragged [her] through many twists and turns."

369.    Jimmy McGill then told JD3 to reevaluate how she wanted to proceed.

370.    JD3 left the meeting with Jimmy McGill confused and frustrated, so she asked her mother to contact AECS athletics to get clarification regarding the formal and informal processes.

---

[80] Jimmy McGill is a pseudonym.

371.    On November 5, 2019, an AECS athletics employee called JD3's mother and told her that the formal Title IX investigation process would result in an immediate suspension of JRL pending the outcome of an investigation.

372.    The AECS athletics employee said the investigation could take "as long as five months" and that JRL would "not even be allowed in the gym" during that time.

373.    The AECS athletics employee said the informal Title IX resolution process could not result in JRL being suspended because it "wouldn't be fair to other players" and it "would have a negative impact on the community" who attended games expecting to see JRL play.

374.    The AECS athletics employee said JRL would be "working with" the Title IX office to "come up with ideas" for his own consequences for raping JD3.

375.    JD3 did not understand why AECS's formal Title IX investigative process would result in mandatory suspension prior to a finding, whereas the informal Title IX resolution process could not result in even a few games' suspension.

376.    No AECS employee was able to explain this to JD3.  She was told, "That's the process."

377.    JD3 did not want to initiate the formal Title IX investigation process because she feared retaliation if JRL was suspended from AECS and the basketball team indefinitely.

378.    On November 6, 2019, Jimmy McGill contacted JD3 and told her that he had "agreed on" consequences for JRL with JRL.

379.    JD3 reasonably understood this to mean that JRL was accepting responsibility and consequences for raping her.

380.    On November 13, 2019, Jimmy McGill notified JD3 that she was no longer being offered the opportunity to read her victim impact statement to JRL via an online streaming service.

381.   On November 14, 2019, JD3 contacted the AECS Title IX office to ask why reading her victim impact statement to JRL via an online streaming service was no longer an option.

382.   On November 15, 2019, AECS Title IX office staff notified JD3 that she could either record a video victim impact statement or write a statement to be read to JRL by a proxy.

383.   No explanation was provided to JD3 as to why she could no longer read her victim impact statement directly to JRL via an online streaming service.

384.   Later that day, JD3 was told that she needed to meet with AECS's Director of Athletics so he could "put his eyes on her."  She was told to meet with him during half time at a hockey game.

385.   JD3's impression of the meeting was that AECS's Director of Athletics did not care about her, but only wanted to make sure she had not changed her mind about proceeding with informal resolution of her Title IX complaint against JRL.

386.   On November 18, 2019, AECS sent JD3 an agreement to sign indicating that she was committing to informal resolution.

387.   Feeling she had no other option, JD3 signed and returned the agreement on November 19, 2019.

388.   On January 3, 2020, JD3 met with AECS's Title IX Coordinator to discuss the specifics of creating her victim impact statement.

389.   On January 6, 2020, JD3 submitted her written victim impact statement to AECS athletics to be read to JRL by proxy.

390.   At that time, AECS athletics staff stated that although the men's basketball and hockey teams were "not great," the women's swim team "wouldn't be at" AECS without them.

391. On January 9, 2020, JD3 met with the AECS Director of Athletics so he could read her victim impact statement to help him understand how she felt.

392. JD3 stated to the AECS Director of Athletics that she felt that, by participating in informal resolution, JRL was accepting some responsibility for the situation.

393. Shockingly, the AECS Director of Athletics responded, "You're wrong."

394. On January 13, 2020, JD3 contacted the AECS Title IX Coordinator to clarify whether JRL had accepted some responsibility.

395. The AECS Title IX Coordinator told JD3 that it was "reasonable to assume" that JRL had accepted some responsibility but it was "subjective" and "on a case-by-case basis."

396. On January 15, 2020, JD3 learned that AECS was going to be running an advertisement featuring JRL to promote its athletics department.

397. AECS staff told JD3 that "nothing could be done about" the advertisement running.

398. JD3 has been in therapy since the rape to help her heal her emotional and psychological trauma resulting from the sexual assault and the subsequent failures of AECS to hold JRL accountable.

399. As a direct and indirect result of Defendants' actions and inactions, JD3 has suffered severe emotional and physical distress, including but not limited to emotional and physical distress including depression, anxiety, and suicidal ideations.

### *AECS and the NCAA*

400. Upon information and belief, AECS has fostered a culture in which female victims are discouraged from reporting sexual assaults, sexual harassment, stalking, and other forms of gender discrimination when those acts are perpetrated by male student-athletes in order

to protect AECS, the male athletics programs, male student-athletes, and the NCAA, at the expense of the female victims.

401.    Discouraging female victims from reporting acts of gender discrimination committed by male student-athletes plausibly creates an environment where male athletes can sexually assault women without repercussion.

402.    Defendants and AECS put the needs of AECS athletics and the NCAA ahead of the needs of JD3 and allowed JRL's needs to supersede those of JD3.

403.    Upon information and belief, Defendants have been fully aware of AECS's acts and omissions regarding a failure to address gender discrimination on its campus, including sexual violence perpetrated by its male student-athletes.

404.    Defendants have repeatedly failed to take any action to address AECS's violations of Defendant NCAA's policies, procedures, and guidelines regarding gender discrimination.

## COUNT I
### Negligence
### (As to all Defendants)

405.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

406.    At all relevant times, Defendants had a duty toward Plaintiffs to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury or danger to student-athletes and by student-athletes.

407.    Defendants acted carelessly and negligently in their positions as the regulatory bodies for college and university athletic teams and their student-athletes.  Defendants knew or should have known that their actions or inaction in light of the rate and extent of sexual assaults reported and made known to Defendants by male student-athletes at NCAA member

institutions would cause harm to female student-athletes and non-student-athletes at NCAA member institution campuses in both the short- and long-term.

408.   Defendants were careless and negligent by breaching the duty of due care it assumed for the benefit of Plaintiffs, both generally and in the following particular respects:

    a)  Failing to warn of the risk of unreasonable harm resulting from Defendants' unwillingness to take seriously the risk of sexual assault against female student-athletes and by male student-athletes at their member institutions;

    b)  Failing to disclose the special risks that are present for female students and student-athletes in NCAA member institution athletic programs;

    c)  Failing to disclose the special risks that are present for all female students who attend NCAA member institutions;

    d)  Failing to promulgate rules and regulations to adequately address the dangers of sexual assault for female student-athletes and by male student-athletes;

    e)  Misrepresenting pertinent facts that female students and student-athletes attending NCAA member institutions needed to be aware of to make determinations of the safety of their educational, program, housing, and practice spaces;

    f)  Concealing pertinent facts;

    g)  Failing to adopt rules and reasonably enforce those rules to minimize the risk to female students and student-athletes attending NCAA member institutions from experiencing sexual assault and sexual violence perpetrated by male student-athletes; and

h) Other acts of negligence or carelessness that may materialize during the pendency of this action.

409. As a direct and proximate cause of Defendants' conduct, actions, and/or inactions, Plaintiffs suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

## COUNT II
### Intentional Infliction of Emotional Distress
### (As to all Defendants)

410. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

411. Defendants engaged in extreme and outrageous conduct.

412. Defendants engaged in such conduct with intent and/or recklessness.

413. As a result of Defendants' extreme and outrageous conduct, Plaintiffs suffered severe emotional distress including, but not limited to: PTSD, loss of sleep, nausea, loss of appetite, anxiety, depression, nightmares, headaches, crying spells, loss of appetite, and such other injuries and physical manifestations as may appear during the course of discovery and trial in this matter.

## COUNT III
### Negligent Infliction of Emotional Distress
### (As to all Defendants)

414. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

415. Defendants' actions and inactions as described previously in this Complaint constitute negligence.

51

416. The events described in this Complaint would naturally and probably result in emotional distress.

417. Defendants' negligent actions and inactions did cause severe emotional distress to Plaintiffs.

418. The emotional distress suffered by Plaintiffs physically manifested itself in symptoms including, but not limited to: PTSD, suicidal ideations, loss of sleep, nausea, loss of appetite, anxiety, depression, nightmares, headaches, crying spells, and such other injuries and physical manifestations as may appear during the course of discovery and trial in this matter.

**COUNT IV**
**Negligent Supervision**
**(As to all Defendants)**

419. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

420. Defendants had a duty to properly supervise, train, and monitor their employees and the employees of NCAA member institutions, and to ensure those employees' compliance with all applicable statutes, laws, regulations, and institutional policies, but the Defendants failed to do so and were therefore negligent.

421. In fact, the Defendant bodies named are comprised of individuals employed at NCAA member institutions and know exactly what is going on day-to-day on their campuses.

422. MSU, UNL, and AECS's failure to timely and properly investigate and address the sexual violence and sexual assault of Plaintiffs and other women on their campuses perpetrated by male student-athletes, and Defendants' failure to monitor the Title IX investigation and

response process at MSU, UNL, and AECS with respect to student-athletes, constitutes negligent supervision.

423.  As a direct and proximate cause of Defendants' conduct, actions, and/or inactions, Plaintiffs suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

**COUNT V**
**Fraud**
**(As to all Defendants)**

424.  Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

425.  Defendant NCAA's constitution, Defendant NCAA Board of Governors Policy on Campus Sexual Violence, and other governing documents make material representations regarding Defendants' obligations to student-athletes and other students on NCAA member institution campuses.

426.  These representations were false.

427.  When Defendants made these representations, they knew they were false, and/or they made the representations recklessly without knowledge of their truth or falsity.

428.  When Defendants made these representations, they did so with the intent that Plaintiffs would act on them by engaging in NCAA athletics and attending NCAA member institutions.

429.  Plaintiffs detrimentally relied on the representations of their individual NCAA member institutions' communications, policies, and procedures, and the member institutions' known relationships with the NCAA, to reasonably protect them from sexual misconduct, violence, and harassment.

53

430.    As a direct and proximate cause of Defendants' conduct, actions, and/or inactions, Plaintiffs suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

## COUNT VI
**Breach of Contract with Student-Athletes**
**(As to All Defendants)**

431.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

432.    Defendant NCAA's constitution, Defendant NCAA Board of Governors Policy on Campus Sexual Violence, and other governing documents outline clear contractual obligations to all student-athletes.

433.    Plaintiffs Roedel, Davis, and JD3 substantially performed all contractual obligations they had to Defendants as student-athletes.

434.    Plaintiffs Roedel, Davis, and JD3 substantially performed all contractual obligations they had to their respective educational institutions.

435.    Plaintiffs Roedel, Davis, and JD3 competed as student-athletes pursuant to all NCAA rules and regulations and provided Defendants with benefits and the ability to earn money from them as successful student-athletes.

436.    Defendants promulgated numerous rules, regulations, and policies with which it requires its student-athletes to comply.

437.    Defendants substantially and materially breached their contractual obligations to Plaintiffs Roedel, Davis, and JD3 pursuant to Defendant NCAA's constitution, Defendant NCAA Board of Governors Policy on Campus Sexual Violence, and other governing documents

by failing to connect off-field behavior of student-athletes, particularly sexual violence, to their ability to play.

438.    As a direct and proximate cause of Defendants' conduct, actions, and/or inactions, Plaintiffs Roedel, Davis, and JD3 suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

<u>COUNT VII</u>
**Breach of Contract with Non-Student-Athletes**
**(As to All Defendants)**

439.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

440.    Defendant NCAA's constitution, Defendant NCAA Board of Governors Policy on Campus Sexual Violence, and other governing documents outline clear contractual obligations to all students at NCAA member institutions, even if they are not student-athletes.

441.    As students at MSU, UNL, and AECS, which are NCAA member institutions, Plaintiffs Kowalski, JD1, JD2, and Thomas are third-party beneficiaries of the contracts and agreements entered into among Defendants, their member institutions, and member institutions' student-athletes.

442.    Defendants substantially and materially breached their contractual obligations to Plaintiffs Kowalski, JD1, JD2, and Thomas pursuant to Defendant NCAA's constitution, Defendant NCAA Board of Governors Policy on Campus Sexual Violence, and other governing documents by failing to connect off-field behavior of student-athletes, particularly sexual violence, to their ability to play.

443.   As a direct and proximate cause of Defendants' conduct, actions, and/or inactions, Plaintiffs Kowalski, JD1, JD2, and Thomas suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

## **DAMAGES**

444.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

445.   As a direct and proximate result of the above-described conduct, Plaintiffs suffered general, special, incidental, and consequential injury and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial.  These past, present, and future damages include, but are not limited to, the following:

    a)  Pain, suffering, and emotional distress;

    b)  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;

    c)  Medical and medical-related expenses;

    d)  Pharmaceutical expenses;

    e)  Loss of education and educational opportunities;

    f)  Loss of employment and earning capacity;

    g)  Prevention from performing daily activities and obtaining the full enjoyment of life;

    h)  Expenses and psychological treatment, therapy, and counseling;

    i)  Loss of the ability to perform as athletes on their chosen teams;

    j)  Loss of society and companionship; and

k)  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants as follows:

a)  Compensatory damages for Plaintiffs' psychological and emotional distress; physical manifestation of emotional distress; embarrassment; loss of self-esteem; humiliation; loss of education and educational opportunities; loss of enjoyment of life; prevention of obtaining full enjoyment of life; loss of earnings past, present, and future; loss of employment and earning capacity; loss of ability to perform athletically; loss of society and companionship; and past, present, and future expenses for medical and psychological treatment and therapy;

b)  Punitive damages;

c)  Statutory interest;

d)  Costs;

e)  Reasonable attorney fees;

f)  Any such other relief as the Court deems appropriate.

## JURY DEMAND

Now come Plaintiffs, by and through their attorneys, Karen Truszkowski and Elizabeth K. Abdnour, and demand a trial by jury.

DATED:        April 29, 2020                     Respectfully submitted,

                                                 */s/ Karen Truszkowski*
                                                 Karen Truszkowski (P56929)
                                                 TEMPERANCE LEGAL GROUP, PLLC
                                                 Attorney for Plaintiffs
                                                 503 Mall Court #131
                                                 Lansing, MI 48912
                                                 844-534-2560 phone
                                                 800-531-6527 fax
                                                 karen@temperancelegalgroup.com

                                                 */s/ Elizabeth K. Abdnour*
                                                 Elizabeth K. Abdnour (P78203)
                                                 ELIZABETH ABDNOUR LAW, PLLC
                                                 Attorney for Plaintiffs
                                                 1146 S. Washington Ave., Ste. D7
                                                 Lansing, MI 48910
                                                 (517) 292-0067 phone
                                                 elizabeth@abdnour.com